UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA LEIF, <br><br> Plaintiff, <br><br> v. <br><br> HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 22-cv-10085-DJC |

MEMORANDUM AND ORDER

**CASPER, J.**                                                                                       **July 18, 2023**

## I. Introduction

Plaintiff Lisa Leif ("Leif") brings this action against Hartford Life and Accident Insurance Company ("Hartford") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that Hartford improperly denied her long-term disability benefits. D. 1. Leif has moved for judgment on the administrative record. D. 20. For the reasons set forth below, the Court DENIES Leif's motion.

## II. Factual and Procedural Background

### A. The Plan

Leif began working at W.B. Mason Company, Inc. ("W.B. Mason") on February 23, 2015. AR 328.[1] Leif participated in Hartford's Group Short Term Disability, Long Term Disability Plan

---

[1] Unless otherwise noted, all facts are drawn from the administrative record ("AR") at D. 19.

for employees of W.B Mason, an ERISA-sponsored employee welfare benefit plan. AR 57. W.B. Mason administers the Plan, but Hartford is the claims administrator. AR 57, 59. Specifically, Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of [t]he Policy." AR 53. Hartford is also liable for benefits payable under the Plan. AR 50. Under the Policy, a participating employee is "entitled to benefits for being Disabled from Your Occupation." AR 53. "Disability or Disabled" means the claimant is "prevented from performing one or more of the Essential Duties of: 1) Your Occupation during the Elimination Period[2]; 2) Your Occupation, for the 3 year(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and 3) after that, Any Occupation." AR 53. "Your Occupation means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job [the claimant is] performing for a specific employer or at a specific location." AR 56.

### B. Leif's Medical History

According to her internist, Dr. David Mudd ("Dr. Mudd"), Leif has "a history of atherosclerotic heart disease, refractory angina, coronary spasms and [chronic obstructive pulmonary disease]." AR 646. Dr. Mudd also reported that Leif "suffered a heart attack in early 2018 and later underwent cardiac catheterization surgery with stent placement on March 15, 2018." Id. Her cardiologist, Dr. Syed Tahir ("Dr. Tahir") noted that on November 6, 2019, Leif was admitted to the hospital for chest pain and underwent a left heart catheterization showing coronary vasospasm. AR 196, 502–03.

---

[2] Under the Plan, the "Elimination Period" is defined as "the longer of the number of consecutive days at the beginning of any one period of Disability which must elapse before benefits are payable or the expiration of any Employer sponsored short term disability benefits or salary continuation program, excluding benefits required by state law." AR 54.

On January 14, 2020, Leif was admitted to Brockton Hospital. AR 433, 521. According to the discharge summary, she reported having chest pain that woke her up from sleep at 2:00 a.m. AR 433. Leif was "seen by cardiology and had [a] myocardial stress test which showed normal myocardial perfusion imaging with no evidence of ischemia or infarction." AR 434. Leif's "symptoms improved while in the hospital" and she was discharged the next day on medication and with instructions to "resume usual activities as tolerated." AR 432, 434.

Following this hospitalization, Leif saw Dr. Mudd several times between January 17, 2020 and June 4, 2020. AR 393–407. On January 17, 2020, according to Dr. Mudd, Leif stated that "the pain is resolved" and that "she wishes to go back to work this coming Monday," to which it does not appear the doctor objected, and would be "following up with cardiology." AR 394. On January 23, 2020, Dr. Mudd noted that he encouraged Leif to "follow-up with cardiology" and that "[i]n the interim she is not working." AR 397. On February 4, 2020, Dr. Mudd noted that Leif "continue[d] to have episodic chest pain exacerbated by stress" and that "[s]he does not feel that she is able to work at this point." AR 400. Dr. Mudd's response was to encourage her to follow up with the cardiologist, "stress [the] importance of smoking cessation" and continue her medication as needed. Id. On February 6, 2020, Dr. Mudd noted that Leif continued to "have episodic chest pain exacerbated by stress" and "[s]he does not feel that she is able to work at this point and papers [to] that effect were completed." AR 519. Dr. Mudd encouraged her again to follow up with cardiology and stressed the importance of quitting smoking. Id. On February 18, 2020, Dr. Mudd noted that Leif was "having recurrent angina that does respond to nitroglycerin." AR 403. He noted that Leif was "unable to work at this point," but again "stressed [the] importance of following up with cardiology." AR 403. On June 4, 2020, Dr. Mudd noted that Leif "continue[d] to have angina" and that he reiterated his recommendation that she follow-up with

3

cardiology. AR 406. Dr. Mudd also noted that "[a] letter excusing [Leif] from work for the next month was provided." AR 406.

After the January 2020 hospitalization, it does not appear that Leif consulted her cardiologist, Dr. Tahir, until August 2020. See AR 502. Leif spoke with Dr. Tahir on August 17, 2020. AR 502–05. Dr. Tahir noted that Leif appeared "stable from [a] cardiac standpoint" and that "[h]er anginal symptoms are better controlled." AR 504. Dr. Tahir also noted that he "again instructed her to completely stop smoking," "continue current antianginal and antiplatelet therapy" and "make herself physically active" as "[d]oing so will reduce her risk of future cardiovascular events." AR 504. Between September 2020 and January 2021, Dr. Mudd noted that Leif "continues to have episodes of angina felt to be surgical candidate medical management indicated" and her anginal symptoms were responding to treatment. AR 530, 682, 685, 688, 691.

On April 18, 2021, Leif was admitted to the emergency room of South Shore Hospital where she received another cardiac catheterization. AR 805, 856. According to the emergency physician, Leif woke up that morning "with moderate to severe, left-sided chest pressure radiating down the left arm" and "[a]ssociated mild shortness of breath . . . not far off of her baseline with history of [chronic obstructive pulmonary disease]." AR 805. Leif's reported pain was "similar to [the] previous myocardial infarction that she had a few years ago that was treated with stents at Brockton Hospital." AR 805.

### C. Leif's Claim for Benefits and Hartford's Occupational Analysis

Leif last worked for W.B. Mason on January 13, 2020. AR 424. Shortly thereafter, she filed a claim for short-term disability benefits under the Plan. AR 188. Hartford approved Leif's claim for short-term disability benefits and extended it through July 12, 2020, the maximum duration of such benefits. AR 217.

On August 4, 2020, Hartford notified Leif that it was evaluating her claim for long-term disability benefits ("LTD"). AR 223. Hartford collected a copy of Leif's job description from W.B. Mason listing her occupation as a Collection Representative and detailing her job duties. AR 598. According to her job description, Leif used "customer service skills to work with customers on delinquent accounts and secure payment" and her "Essential Duties and Responsibilities" included, but were not limited to, "speak[ing] with customers to determine reason for overpayment" and "reconcil[ing] discrepancies with customers." Id. Hartford also sought an occupational analysis (the "Occupational Analysis") from Andrew Berlin ("Berlin"), a vocational rehabilitation clinical case manager. AR 104–05, 322. In his report, Berlin concluded that Leif's occupation in the general workplace was "Collection Clerk" as defined in the United States Department of Labor's *Dictionary of Occupational Titles* ("DOT"). AR 104. He concluded that the essential duties of that occupation in the general workplace involved "notify[ing] or locat[ing] customers with delinquent accounts and attempt[ing] to secure payment, using postal services, telephone, or personal visit." AR 104. He also concluded that Leif's occupation in the general workplace is "[s]edentary," but that her job for Mason was "light-medium" work, having greater physical requirements than her occupation in the general workplace, including "regular standing, walking, frequent use of hands and fingers for data entry, and regular lift[ing] and/or mov[ing] up to 25 pounds." AR 104–05.

### D. Hartford's Initial Denial

On October 12, 2020, Hartford denied Leif's claim for LTD benefits. AR 320. Hartford's letter informing Leif of its decision recounted the steps it took to review Leif's claim. AR 322. Hartford reviewed "[a]ll the information contained in [Leif's] file." AR 321-22. Hartford

"concluded from the combination of all the medical information in [her] file that [she was] able to perform the essential duties of [her] occupation." AR 322.

### 1. Dr. Mudd's Attending Physician's Statement

Leif submitted an Attending Physician's Statement, dated September 11, 2020, in which Dr. Mudd stated that Leif was "unable to work" due to "unstable angina." AR 424–25. On September 18, 2020, a representative from Hartford reached out to Dr. Mudd requesting that he furnish additional information regarding his opinion of Leif's ability to work. AR 544. Dr. Mudd indicated that, as of July 10, 2020, Leif did not have "the physical functionality" to work "40 hours per week, primarily seated in nature . . . ." AR 544–45. Dr. Mudd further noted that Leif "ha[d] advanced coronary artery disease which restricts her physically significantly due to angina and shortness of breath." AR 546.

### 2. Dr. Tahir's Attending Physician's Statement

Leif submitted an Attending Physician's Statement, dated September 15, 2020, in which Dr. Tahir stated that Leif suffered from coronary vasospasm, unstable angina, exertional dyspnea, chest pain and shortness of breath. AR 428. Dr. Tahir also noted that Leif is "unable to return to work until further notice." AR 428.

### 3. Dr. Medrek's Peer Review Report

On September 29, 2020, Hartford sought an independent medical review from Dr. Paul Medrek, an Occupational Medicine Specialist. AR 571–80, 584. As part of his review, Dr. Medrek conferred with Dr. Mudd. AR 571. Dr. Medrek also attempted to contact Dr. Tahir, but "peer-to-peer contact was not successful with [this] provider." AR 577. Dr. Medrek noted that "[d]espite chest pain and angina reports, there are no specific physical findings in the medical records furnished to suggest that the claimant would be precluded from work due to any medical

conditions." AR 577. He reasoned that "there [was] insufficient documentation regarding any deficits in strength, range of motion, coordination, sensation, or gait abnormality to support complete impairment." AR 577. Dr. Medrek did note, however, that the medical record supported "a degree of physical functional impairment" for Leif. AR 577. Dr. Medrek concluded that Leif could work full-time with certain restrictions and limitations on how long she would be required to stand and walk and how many pounds she would be required to lift, carry, push and pull. AR 575–77.

  **F.**  **Leif Seeks Administrative Appeal**

On April 9, 2021, Leif appealed Hartford's denial. AR 639–644. In her appeal letter, Leif argued that "Hartford's decision failed to properly address how the stressful nature of her position would exacerbate her underlying cardiac issues, most notably, her high blood pressure and unstable angina." AR 640. In support of her appeal, Leif submitted updated medical records from Brockton Hospital, two studies "demonstrating the unhealthy correlation between high stress levels and cardiac issues" and a letter of support and Cardiac Medical Source Statement from Dr. Mudd, dated February 18, 2021 and April 6, 2021, respectively. AR 646–710. Hartford, in turn, sought peer reviews in July 2021 from Drs. Andre Akhondi ("Dr. Akhondi"), Matthew Chan ("Dr. Chan") and Benton Ashlock ("Dr. Ashlock"), a panel of independent physicians selected by Exam Coordinators Network. AR 1063–82.

    *1.* *Dr. Mudd's Letter and Cardiac Medical Source Statement*

In the February 18, 2021 letter, Dr. Mudd expressed "concern[ ] that having Lisa return to her stressful occupation in debt collection where she would regularly call client's [sic] to pay past due pills [sic] and has to deal with unhappy and verbally abusive client's [sic] is inconsistent with optimal treatment for angina and cardiac symptoms." AR 646. Dr. Mudd also expressed "concern[

] that this line of work could worsen [Leif's] hypertension and stress levels as she would need to be more active than usual. This would likely exacerbate the symptoms of exertional dyspnea. Furthermore, Ms. Leif has coronary vasospasm which causes chest tightness, shortness of breath and could potentially result in myocardial infarction." AR 646. Dr. Mudd further stated that "[e]ven after stopping work, [Leif] is still very compromised in terms of her daily activities and remains symptomatic with angina symptoms despite making major changes in her life" and that "attempting to return to her former [occupation] would place her health and safety in serious jeopardy and threaten her long-term health and ongoing recovery." AR 646–47.

In a Cardiac Medical Source Statement, dated April 6, 2021, Dr. Mudd indicated that Leif is "unable to work" and that stress could "worsen her symptoms." AR 707–10. Dr. Mudd concluded that Leif was incapable of even "low stress" work and that there was a "feedback loop" between her angina, anxiety and stress. AR 708.

*2. Drs. Akhondi, Chan and Ashlock's Peer Review Reports*

Dr. Akhondi noted that "[b]ased on the medical documentation reviewed, the claimant [has] a history of coronary artery disease, angina, chronic obstructive pulmonary disease, and hypertension, but recent medical records reveal she is stable from [a] cardiac standpoint, and her angina symptoms are better controlled." AR 1067. Dr. Akhondi "disagree[d] that the claimant cannot work, as there are no measurable findings showing any functional deficits. Recent physical exams are unremarkable, and the claimant has stable vital signs. The claimant is not dyspneic at rest but needs to avoid exertion." AR 1068.

Dr. Chan noted that "[b]ased on the information provided, the claimant is suffering from a diffuse coronary artery disease with recurrent unstable anginal episodes which were relieved by nitroglycerin. . . . The claimant has stable vital signs and is not hypoxic nor does the claimant

8

require supplemental oxygen treatment.  There is no evidence of left ventricular systolic dysfunction.  Therefore, no restrictions and limitations are indicated." AR 1072.  Dr. Chan "respectfully disagreed[d] that the claimant is unable to sit, stand, and walk.  Given that she has unstable angina, the claimant would intuitively assume a seated position most of the time if not always. . . . The claimant's prognosis does not appear poor but rather guarded considering risk factors and her non-modifiable age risk factor.  With regard to basic physical tasks, the claimant is not limited." AR 1073.

Dr. Ashlock noted that "[t]aking into consideration the entire clinical picture, including standards of care and evidence-based medicine, and any medication or other treatment side effects, the claimant has no impairments that translate into restrictions and limitations from 7/11/20 to the present." AR 1075.  Dr. Ashlock "respectfully disagreed[d] with the attending physician's opinion of the claimant being unable to tolerate any form of work, as the claimant had no findings which indicated an inability of the claimant to tolerate activities such as sitting for prolonged periods." AR 1077.  Dr. Ashlock also concluded that "despite the fatigue on exertion that would accompany a NYHA class III heart failure, the claimant still has some ability to tolerate walking and standing, although limited due to her underlying pathology.  Taking this into consideration with the appropriate restrictions and limitations applied to accommodate the claimant's expected and current deficits, she still has the ability to sustain work activity." AR 1077.

On July 23, 2021, Drs. Akhondi, Chan and Ashlock conducted a telephone conference where they "consolidated [their] respective opinions and reached agreement regarding [their] consensus recommendation." AR 1078.  They agreed that Leif could sit without restrictions, stand and walk "[o]ccasionally, for up to 2 hours per day" and lift, carry, push and pull "[o]ccasionally, up to 20 lbs. with [bilateral upper extremities]." AR 1078.

On August 6, 2021, Hartford provided these independent medical reviews to Leif's counsel, Dr. Tahir and Dr. Mudd.  AR 201.

### 3. Additional Medical and Occupational Information Submitted by Leif

On August 27, 2021, Leif wrote to Hartford and Drs. Akhondi, Ashlock and Chan, arguing that their independent medical reviews "did not contemplate how the stress of working as a debt collector would exacerbate her condition, and thus dodged the main issue presented within her appeal."  AR 1141.  Leif enclosed a printout of Occupational Information Network ("O*NET") job responsibilities for "Bill and Account Collectors."  AR 1143–1152.  With respect to "work context," O*NET assigned a rating of 75 to the category "Frequency in Conflict Situations," a rating of 70 to the category "Deal with Unpleasant or Angry People" and a rating of 50 to the category "Frustrating Circumstances."  AR 1149.  Leif also enclosed more studies demonstrating a correlation between stress and cardiovascular disease.  AR 1153–1186.  Hartford sent Leif's August 27, 2021 response to Drs. Akhondi, Ashlock and Chan, each of whom reported that it did not alter their conclusions.  AR 1197, 1203, 1211.

### E. Hartford Upholds Its Determination

On November 8, 2021, Hartford informed Leif's counsel that it had completed its "comprehensive appeal review and determined that the denial of your client's claim will be upheld."  AR 206-11.  Hartford based its appeal decision upon its "full and fair review of Policy language and all documents contained in [Leif's] claim file, viewed as a whole" including new information:  Medical records from Good Samaritan Hospital and South shore [sic] Hospital" and documentation "outlining the impact of Cardiovascular disease on Ms. Leif's occupation."  AR 206.  Hartford forwarded all of Leif's medical documentation, except the prior review by Dr. Medrek "to Exam Coordinator's Network to coordinate an independent medical records review"

by Drs. Akhondi, Chan and Ashlock. AR 208. Hartford noted that it "specifically asked the reviewer to comment on [Leif's] overall functionality from July 11, 2020, including the cumulative impact of multiple conditions, medications, and the ability to sustain work on a consistent basis." AR 208. Hartford then summarized the opinions of Drs. Akhondi, Chan and Ashlock. AR 208–210. Based upon this evidence, Hartford concluded that "the medical evidence does not support that [Leif's ongoing] symptoms are of such severity that she would be precluded from performing her own occupation through and beyond the Elimination Period as required by the Policy." AR 210.

### F. Leif Seeks Judicial Review

On January 21, 2022, Leif filed the instant complaint, charging that she is entitled to LTD benefits under the Plan. D. 1 ¶¶ 18–20. On January 25, 2023, Leif moved for judgment on the record, D. 20. The Court heard argument on the motion and took the matter under advisement. D. 29.

## III. Discussion

### A. Standard of Review

Where an ERISA plan administrator is granted clear discretionary authority to determine eligibility for benefits or to construe the terms of the plan at issue, then the review of its claims determination under 29 U.S.C. § 1132(a)(1)(B) is made under the arbitrary and capricious/abuse of discretion standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 107, 115 (1989); McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 379 (1st Cir. 2015). This standard of review is deferential; that is, the court must uphold the plan administrator's benefit decision if it "is reasonable and supported by substantial evidence on the record as a whole." Id. "Substantial evidence" is "evidence reasonably sufficient to support a conclusion." Doyle v. Paul Revere Life

Ins. C., 144 F.3d 181, 184 (1st Cir. 1998). "[A] conclusion can still be supported by substantial evidence if contrary evidence exists." Ovist v. Unum Life Ins. Co. of Am., 14 F.4th 106, 117 (1st Cir. 2021).

The parties agree that this deferential standard of review applies here as under the Plan, Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of [t]he Policy." AR 53; see D. 21 at 7; D. 25 at 6.[3]

### B. Hartford's Determination that Leif Was Able to Work Was Reasonable and Supported by Substantial Evidence

Leif filed a claim for benefits after reporting being unable to work because she, as Dr. Mudd noted, "continue[d] to have episodic chest pain exacerbated by stress." AR 350. Hartford reviewed Leif's medical record and approved her claim for short-term disability benefits, but denied her claim for LTD benefits because it determined that "[t]he combined information in [her] file [did] not show that [she was] unable to perform the Essential Duties of [her] Occupation on a

---

[3] Where an ERISA plan administrator "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket. . . . this dual role creates a conflict of interest." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). Where such a conflict exists, "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits," but "the significance of [this] factor will depend upon the circumstances of the particular case." Id.

Here, Hartford both determines whether claims for LTD benefits satisfy the terms of the Plan and is liable for benefits payable under the Plan, AR 50, 59, and accordingly, such structural conflict of interest exists. The Court is persuaded, however, that Hartford protected the integrity of its claims determination process by referring Leif's appeal to independent physicians for review. AR 571–80, 584, 1063–82. Leif does not assert that Hartford's decision to deny her benefits was an "actual conflict," or, an "instance[] in which the fiduciary's decision was in fact motivated by a conflicting interest." Denmark v. Liberty Life Assur. Co. of Bos., 566 F.3d 1, 5 n.2 (1st Cir. 2009); see D. 21 at 20. Consequently, a structural conflict "will act as a tiebreaker" if the relevant considerations are "closely balanced." Denmark, 556 F.3d at 9 (quoting Glenn, 554 U.S. at 117). However, for the reasons discussed below, the Court concludes that the considerations in this case are not closely balanced and, therefore, the Court has not accorded Hartford's structural conflict tie-breaking weight.

full time basis as of 07/11/2020." AR 322. In conducting its further review upon Leif's appeal, Hartford sought independent peer reviews of Leif's medical records and the Occupational Analysis. AR 104–05, 322, 1063–82. Hartford concluded that "the medical evidence [did] not support that" Leif's ongoing symptoms were "of such severity" that she "would be precluded from performing her own occupation through and beyond the Elimination Period as required by the Policy." AR 210. Accordingly, Hartford affirmed its decision to deny Leif's application for LTD benefits. AR 210.

Under the Policy, a participating employee is "entitled to benefits for being Disabled from Your Occupation." AR 53. The Policy defines "Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job [the claimant is] performing for a specific employer or at a specific location." AR 56.

The Court concludes that Hartford's determination that Leif was not "Disabled" under the Policy was "reasonable and supported by substantial evidence on the record as a whole." McDonough, 783 F.3d at 379. The record shows that Hartford considered the Occupational Analysis, which determined that the essential duties of Leif's "Own Occupation in the general workplace" was "sedentary" and involved "notify[ing] or locat[ing] customers with delinquent accounts and attempt[ing] to secure payment, using postal services, telephone, or personal visit." AR 104–105, 207–208. Hartford also considered the independent peer reviews of Drs. Akhondi, Chan and Ashlock, who all agreed that Leif could sit without restrictions, stand and walk "[o]ccasionally, for up to 2 hours per day" and lift, carry, push and pull "[o]ccasionally, up to 20 lbs. with [bilateral upper extremities]." AR 1078.[4]

---

[4] In a post-hearing notice, D. 30, Leif cited O'Connell v. Hartford Life & Accident Ins. Co., No. 21-cv-10587-AK, 2023 WL 2633789, *1 (D. Mass. Mar. 24, 2023) as further support for her argument. In that case, the court concluded that the claims administrator did not give appropriate

13

> a. *Whether Hartford Arbitrarily Focused on Whether Leif Could Perform Any Sedentary Occupation*

Leif argues that "Hartford's review arbitrarily focused on whether Ms. Leif had work capacity to perform any sedentary occupation, instead of whether she retained the ability to perform Your Occupation, as Performed in the General Workplace as required by the terms of the policy." D. 21 at 12. She cites the First Circuit's decision in McDonough to support this argument. In that case, the plan defined the plaintiff's "'own occupation' as the occupation 'routinely perform[ed]' by the participant at the time the disability began as that occupation is 'normally performed in the national economy,' rather than how it is performed for the employer." McDonough, 783 F.3d at 377. The First Circuit concluded that the claims administrator's "decision to terminate the appellant's LTD benefits was not a reasoned determination because its "failure to articulate the contours of the own occupation standard, apply that standard in a

---

consideration to the claimant's treating physicians, did not properly explain why it disagreed with the medical evidence offered and abused its discretion by failing to evaluate the claimant's limitations against the demands of her occupation. O'Connell, 2023 WL 2633789, at *9–14. Even assuming that O'Connell applies the correct legal standard, D. 31 at 2, O'Connell can be distinguished from this case because Leif's treating physicians and the peer review physicians largely agreed on her diagnoses and medical condition, differing only with respect to the activity restrictions warranted by her condition. Compare AR 424–25, 428 with AR 1063–82. Moreover, whereas the claims administrator in O'Connell did not perform a vocational analysis, see O'Connell, 2023 WL 2633789, at *13, here, Hartford performed and relied upon such analysis here. AR 104–105. In its final determination letter, Hartford summarized the findings of the Occupational Analysis and summarized the reasons why each of the peer review physicians did not support the work restrictions that Leif's treating physicians recommended. AR 208–210. Considering that the opinions of Leif's treating physicians are "not entitled to special deference," Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 526 (1st Cir. 2005) (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003)); see D. 31 at 2 (and case cited), the Court concludes that Hartford's final determination letter adequately explained its reasons for denying Leif's claim. Orndorf, 404 F.3d at 526 (noting that "[t]he denial letter need not detail every bit of information in the record; it must have enough information to render the decision to deny benefits susceptible to judicial review").

meaningful way, and reason from that standard to an appropriate conclusion regarding the appellant's putative disability render[ed] its benefits-termination decision arbitrary and capricious." Id. at 380, 382 (citations omitted).

Here, Hartford's review process is readily distinguishable. In its denial, Hartford articulated the contours of the occupation standard as the "general workplace." AR 210, 322. Accordingly, it obtained the Occupational Analysis which showed Leif's "occupation in the general workplace" to be "sedentary" and her essential duties in the general workplace to involve "notify[ing] or locat[ing] customers with delinquent accounts and attempt[ing] to secure payment, using postal services, telephone, or personal visit." AR 104–05. It then gave more weight to the consensus opinion of Drs. Akhondi, Chan and Ashlock, who all agreed that Leif could perform her essential duties of such employment in the general workplace with some limitations and restrictions. AR 210. Relying on this occupational standard of the "general workplace" and the medical evidence indicating that Leif could perform such work, Hartford reasoned to an appropriate conclusion that Leif could perform "her own occupation throughout and beyond the Elimination Period as required by the Policy." Id.

The other cases that Leif cites are also distinguishable. In Whetstone v. United of Omaha Life Ins. Co., No. 2:20-CV-3756, 2022 WL 896784, at *6 (S.D. Ohio Mar. 28, 2022), the claims administrator determined that the plaintiff could perform at least one of the "Material Duties" of his "Regular Occupation" without defining either of those terms. The court concluded that the claims administrator's conclusion "did not rationally follow from the opinions of its peer reviewers and [ ] was otherwise inconsistent with the quantity and quality of the medical evidence." Id. at *9 (citation and internal quotation marks omitted). By contrast, as discussed above, Hartford both

15

defined Leif's essential duties and occupation in the general workplace and came to a conclusion that rationally followed from the opinions of the medical peer reviewers.

In Miller v. Am. Airlines, Inc., 632 F.3d 837, 855–56 (3d Cir. 2011), the court concluded that the claims administrator's denial was arbitrary and capricious because, *inter alia*, the claims administrator "reversed its initial position that [the plaintiff] was disabled and terminated his benefits without receiving supporting information that differed in any material way from the information upon which it previously relied." By contrast, here, Hartford initially denied Leif's application for LTD benefits, relying upon all of the medical information in the file, including but not limited to Dr. Medrek's peer review to conclude that Leif could "perform the essential duties of [her] occupation," AR 322, and upheld this denial after considering the Occupational Analysis, AR 104-05, the additional information Leif provided and the consensus opinions of Drs. Akhondi, Chan and Ashlock, AR 206-211, which further supported its initial decision to deny LTD benefits.

Finally, in Winters v. Liberty Life Assurance Co. of Bos., No. CV 20-11937-MLW, 2022 WL 6170588, at *19 (D. Mass. Oct. 7, 2022), the court concluded that a claims administrator's denial of LTD benefits was unreasonable because it improperly "conflated [the plaintiff's] Own Occupation with general sedentary or light work." By contrast, here, Hartford relied upon the Occupational Analysis, which specifically evaluated the physical demands of Leif's "Own Occupation in the general workplace." AR 104–05. Moreover, Hartford relied upon the consensus opinion of peer medical reviews that concluded that Leif could sit without restrictions, stand and walk "[o]ccasionally, for up to 2 hours per day" and lift, carry, push and pull "[o]ccasionally, up to 20 lbs. with [bilateral upper extremities]," AR 1078, all of which either met or exceeded the physical demands of Leif's "Own Occupation in the general workplace" according to the Occupational Analysis. AR 104–05.

### b. *Whether Hartford Arbitrarily Discounted the Impact of Occupational Stress*

Leif also argues that Hartford "discount[ed] the impact occupational stress and risk of harm had on her cardiac health." D. 21 at 18. The record shows that Dr. Mudd was "concerned that having [Leif] return to her stressful occupation in debt collection where she would regularly call client's [sic] to pay past due pills [sic] and has to deal with unhappy and verbally abusive client's [sic] is inconsistent with optimal treatment for angina and cardiac symptoms." AR 646. Leif also submitted several journal articles that show a correlation between stress and cardiovascular disease. AR 648–669, 1153–1186. The first article is a study that "imaged the amygdala, a brain region involved in stress, to determine whether its resting metabolic activity predicts risk of subsequent cardiovascular events" and concluded that its findings "provide novel insights into the mechanism through which emotional stressors can lead to cardiovascular disease in human beings." AR 648. The second article discussed prospective studies that show an "increased risk of coronary heart disease among adults experiencing social isolation and . . . workplace stress . . . ." AR 658. The third article discussed a study of 300 young and middle-aged adults that showed that "those who endured myocardial ischemia with mental stress had a two-fold higher likelihood of having another heart attack or dying from heart disease compared with those who did not have cardiac ischemia induced by mental stress." AR 1165. The fourth article is a report that "explore[d] the ramifications of stress in terms of the effects of acute versus long-term stressors on cardiac function" and concluded that there is "overwhelming evidence both for the deleterious effects of stress on the heart and for the fact that vulnerability and resilience factors play a role in amplifying or dampening those effects." AR 1168.

Although Hartford's final determination letter does not discuss the evidence she submitted regarding stress, see AR 206–211, the Court "do[es] not read the denial of benefits to have ignored

17

significant material evidence submitted by [Leif]." Orndorf, 404 F.3d at 526. While the Court is sympathetic to the potential role that stress may play in exacerbating Leif's cardiac condition, this case turns upon whether Leif met her burden of showing that her cardiac issues preclude her from performing the essential duties of her occupation as a debt collector in the general workplace. See O'Connell, 2023 WL 2633789, at *7 (noting that "[u]nder any standard of review, the claimant bears the burden of proving disability within the meaning of her plan") (citing Orndorf, 404 F.3d at 518–519). Dr. Mudd's opinion that stress "is inconsistent with optimal treatment" for Leif and that working "would likely exacerbate the symptoms of exertional dyspnea," AR 646, does not establish that such stress would preclude her from working in her occupation in the general workplace. Moreover, while the journal articles suggest that stress and cardiovascular disease are generally linked, only one of the articles mentions workplace stress, and none of the articles discuss stress in the context of the debt collection occupation. Accordingly, despite the evidence in the record linking stress to cardiovascular disease, it was not unreasonable for Hartford to conclude that she could still perform the essential duties of her occupation.

c. *Whether Hartford Arbitrarily Discounted the O\*NET Materials*

Leif's argument that Hartford failed to consider the materials from O\*NET that she submitted on appeal is also unavailing. D. 21 at 17. In the First Circuit, "a claims administrator may properly consider a position description drawn from the DOT in assessing a claim of disability as long as it involves duties comparable to those of the claimant's own job." McDonough, 783 F.3d at 381 (citing Tsoulas v. Liberty Life Assur. Co. of Bos., 454 F.3d 69, 78 (1st Cir. 2006)). Here, the Occupational Analysis that Hartford relied upon drew Leif's position of "Collection Clerk" from the DOT. AR 104. Leif has not presented evidence to suggest that this DOT position description is not comparable to that of her own job. Indeed, the tasks required of "Bill and

Account Collectors" according to Leif's O*NET submission are consistent with those described in the Occupational Analysis. The O*NET description includes tasks such as "mails form letters to customers to encourage payment of delinquent accounts," "persuades customer to pay amount due on credit account, damage claim, or nonpayable check, or negotiates extension of credit" and "receives payments and posts amount paid to customer account using computer or paper records." AR 1143. These tasks, among the others listed on O*NET, are comparable to the essential duties found in the Occupational Analysis, which are described as "notify[ing] or locat[ing] customers with delinquent accounts and attempt[ing] to secure payment, using postal services, telephone, or personal visit" for her occupation in the general workplace. AR 104–05. Accordingly, it was reasonable for Hartford to rely upon the Occupational Analysis, rather than the O*NET submission, in its final determination.

For all these reasons, Hartford's determination that Leif could perform her occupation as it is recognized in the general workplace, as defined under the Policy, was reasoned and supported by substantial evidence.

### C. Any Procedural Issues with Hartford's Denial Letters Did Not Prejudice Leif

Finally, Leif claims that a number of procedural issues in Hartford's denial letters "prejudiced [her] ability to appeal and should weigh[ ] against the reasonableness of its decision." D. 21 at 19. "A claimant typically must demonstrate that he or she has been prejudiced as a result of the notice's inadequacy." Niebauer v. Crane & Co., 783 F.3d 914, 927 (1st Cir. 2015). Leif claims that Hartford's original denial letter did not provide her with appeal rights as required by ERISA. D. 21 at 19. The record shows, however, that Hartford provided Leif's counsel with an updated letter containing the requisite appeal notice. Compare AR 197 with AR 323; see Fisher v. Harvard Pilgrim Health Care of New England, Inc., 380 F. Supp. 3d 155, 166 (D. Mass. 2019)

19

(concluding that plaintiff was not prejudiced by a deficiency in first letter where subsequent letter cured defect). Moreover, Leif does not explain how she was prejudiced when the record shows that she did, in fact, appeal before receiving the updated letter regarding her appellate rights and submitted evidence and argument in connection with that appeal. AR 639–710.

Leif also claims "while [Hartford]'s initial decision communicated she had a light duty occupation, the final denial reclassified the physical demands of her occupation to sedentary without providing her with the opportunity to respond and/or comment." D. 21 at 19. The record shows, however, that Hartford's final denial relied on the Occupational Analysis, dated October 15, 2020, which classified Leif's occupation in the "general workplace" as sedentary, AR 105, and Leif received her "[c]omplete LTD claim file, including comments and letters, covering the period of 05/26/2020 - 10/15/2020" before she filed her administrative appeal. AR 326.

Accordingly, Leif has not shown how any procedural issues with Hartford's letters prejudiced her claim for LTD benefits.

IV.   **Conclusion**

For the foregoing reasons, Leif's motion for judgment on the record is DENIED.

**So Ordered.**

/s/ Denise J. Casper<br>United States District Judge